IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| IN RE: | ) | Chapter 11 |
| | ) | |
| PCS FINANCIAL CORP., | ) | Case No. 08-30930 |
| | ) | Case No. 08-30934 |
| In re: | ) | |
| | ) | Judge Hollis |
| PRIME ACCEPTANCE CORP., | ) | |
| | ) | |
| Debtors/Debtors-in-Possession. | ) | |

## DEBTORS' JOINT FIRST AMENDED DISCLOSURE STATEMENT

**DEBTORS' COUNSEL**:
DAVID K. WELCH, ESQ.
(Atty. No. 06183621)
ARTHUR G. SIMON, ESQ.
(Atty. No. 03124481)
SCOTT R. CLAR, ESQ.
(Atty. No. 06183741)
JEFFREY C. DAN, ESQ.
(Atty. No. 06242750)
CRANE, HEYMAN, SIMON, WELCH & CLAR
135 S. LaSalle St., Suite 3705
Chicago, IL 60603
(312) 641-6777

1

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| IN RE: | ) | Chapter 11 |
| | ) | |
| PCS FINANCIAL CORP., | ) | Case No. 08-30930 |
| | ) | Case No. 08-30934 |
| In re: | ) | |
| | ) | Judge Hollis |
| PRIME ACCEPTANCE CORP., | ) | |
| | ) | |
| Debtors/Debtors-in-Possession. | ) | |

## DEBTORS' JOINT FIRST AMENDED DISCLOSURE STATEMENT

PCS FINANCIAL CORP. ("PCS") and PRIME ACCEPTANCE CORP. ("Prime"), [1]
by and through their Attorneys, submit this Joint First Amended Disclosure Statement
("Disclosure Statement") pursuant to Section 1125 of the Bankruptcy Code and in
conjunction with their Joint First Amended Plan of Reorganization ("Plan").  A copy of
the Plan is attached to this Disclosure Statement as **Exhibit A**.

## INTRODUCTION

The Debtors filed their voluntary petitions for relief under Chapter 11 of the
Bankruptcy Code on November 13, 2008 ("Petition Date").  The Debtors are operating
their businesses and managing their financial affairs as Debtors in Possession pursuant

---

[1]PCS and Prime are, at times, jointly referred to in this Disclosure Statement as the
"Debtors."

to Sections 1101, 1107 and 1108 of the Bankruptcy Code.[2]  No trustee, examiner or

committee of unsecured creditors has been appointed to serve in these Chapter 11

cases.  On December 2, 2008, the Bankruptcy Court entered an Order authorizing the

joint administration of the Chapter 11 cases of PCS and Prime.

The Debtors are the proponents of the Plan.  The Plan provides for distributions

to the holders of Allowed Claims from funds realized from the continued operation of the

Debtors' businesses on a merged basis as well as from existing cash deposits and cash

resources of the Debtors.  Under Article VI of the Plan, Prime will be merged into PCS

thereby formally consolidating the Debtors' businesses, assets and liabilities into a

single consolidated entity bearing the corporate name of "PCS Receivables Corp."

## SUMMARY OF TREATMENT OF CLAIMS
## AND INTERESTS UNDER THE PLAN

The Plan has one (1) category of Administrative Claims, four (4) Classes of

creditors (Classes 1 through 4) and one (1) Class of Interests (Class 5).  The Claims

and Interests, and the treatment thereof, under the Plan consist of the following:[3]

---

[2]Unless defined in this Disclosure Statement, capitalized terms are defined in Article I of
the Plan.
[3]This chart is intended to provide the information required by Rule 3016-1 of the Local
Rules of this Court.

## Administrative Claims[4]

Administrative Claims are unimpaired under the Plan and primarily consist of Allowed Claims comprised of fees and expenses of the various professionals employed pursuant to Orders entered by the Bankruptcy Court. These fees and expenses are projected as follows:

| Professional | Amount[5] |
|---|---|
| Crane, Heyman, Simon, Welch & Clar<br>Debtors' Counsel | $150,000.00 |
| Seldon Fox,<br>Debtors' Accountant | $100,000.00 |
| Amherst Partners,<br>Debtors' Financial Advisor | $75,000.00 |
| Christopher Manning, Burke Warren, et al.,<br>Debtors' Special Counsel | $50,000.00 |

The amounts projected to professionals holding Allowed Administrative Claims are in addition to amounts previously paid as retainers and allowed as interim compensation

---

[4]Since the Debtors' Chapter 11 cases were commenced as voluntary proceedings, no claims under Sections 507(a)(3) and 502(f) of the Bankruptcy Code exist.

[5] All of these amounts are merely the Debtor's estimates and are, therefore, subject to change. Furthermore, in projecting these amounts, the Debtors expect a contested Confirmation hearing.

and reimbursement of expenses pursuant to the prior Orders of the Bankruptcy Court.

The amounts previously allowed and paid to these professionals are as follows:

| Professional | Amounts Previously Allowed | Basis for Prior Payment |
|---|---|---|
| Crane, Heyman, Simon, Welch & Clar Debtor's Counsel | $270,195.93 | Court-Approved Interim Compensation |
| Seldon Fox, Debtors' Accountant | $203,855.77 | Court-Approved Interim Compensation |
| Amherst Partners, Debtors' Financial Advisor | $24,014.00 | Court-Approved Payments |
| Christopher Manning, Burke, Warren, et al., Debtors' Special Counsel | $38,511.00 | Court-Approved Interim Compensation |

No professional shall be paid unless and until the Bankruptcy Court has entered appropriate Orders allowing the compensation and reimbursement of expenses requested by such professionals.

Also included in this category of Administrative Claims are post-petition trade payables. Under the Plan, post-petition trade payables will be paid in the ordinary course of business pursuant to the credit terms existing at the time the claim was incurred.

Other than post-petition trade payables, all Administrative Claims, to the extent allowed, will be paid in full in cash on the Effective Date or as soon as practicable thereafter or as agreed to by the holder of each Allowed Administrative Claim. The

700028816

5

source of funds for payment of such Administrative Claims will be the cash resources of the Debtors or such other cash as may be generated by the Debtors from the operation of their businesses in the ordinary course.

## Tax Claims

The Plan has a specific provision for the payment of taxes which are of the type entitled to priority under Section 507(a)(8) of the Bankruptcy Code (Article IV, Section 4.2 of the Plan). The only Tax Claim in these Chapter 11 cases was filed by the Internal Revenue Service in the amount of $34,483.45 ("IRS Claim"). The Debtors intend to object to the IRS Claim as no such amount is due and owing to the IRS. However, the Plan provides that to the extent any Tax Claim is allowed, such Tax Claim shall be paid in full, inclusive of allowed interest as provided by applicable federal or state statutes, in cash on the Effective Date, unless the holder of a Tax Claim agrees to a different treatment. This treatment of Allowed Tax Claims is intended to comply with the requirements of Section 1129(a)(9)(C) of the Bankruptcy Code. The Debtors believe that there will be no Allowed Tax Claims.

## Secured Claim of The Pre-Petition Agent

The Pre-Petition Agent is the holder of the Allowed Class 1 Claim for the benefit of the Pre-Petition Lenders. Class 1 Claims are impaired under the Plan.[6] The

---

[6]The Pre-Pretition Agent is a lender and administrative agent under that certain Third Restated Loan and Security Agreement dated as of September 1, 2002 (as amended, supplemented or otherwise modified prior to the Petition Date).

actual allowed amount of the Class 1 Claim is subject to adjustment for payments made to the Pre-Petition Agent by the Debtors pursuant to Orders entered by this Court after the filing of the Plan as well as based upon an accounting by the Pre-Petition Agent for all payments received and charges made.   The Pre-Petition Agent shall retain, for the benefit of the Pre-Petition Lenders: (1) the liens and security interests it had against the Debtors' property as of the Petition Date; and (2) any liens and security interests it acquired against the Debtors' property during the course of these Chapter 11 cases pursuant to Orders entered by the Bankruptcy Court.

The treatment of the Allowed Class 1 Claim under the Plan is the result of extensive negotiations between the Debtors and the Pre-Petition Agent and Pre-Petition Lenders.  The specific treatment of the Allowed Class 1 Claim under the Plan is embodied in the Post-Confirmation Loan Agreement attached to the Plan as **Exhibit B**. Generally, the Debtors shall pay the Allowed Class 1 Claim in full, with interest pursuant to the terms and conditions set forth in the Post-Confirmation Loan Agreement.

The Debtors may accelerate payments to the holder of the Allowed Class 1 Claim. All unaccrued interest shall be deemed waived and no penalty shall be chargeable to the Debtors in the event that the Debtors elect to accelerate payments.

Upon completion of the payments under the Plan to the Pre-Petition Agent (for the benefit of the Pre-Petition Lenders) as against the Allowed Class 1 Claim as required by the Plan, all of the liens and security interests of the Pre-Petition Agent and the Pre-Petition Lenders shall be deemed released and discharged.  To the extent requested by the Debtors, once the Allowed Class 1 Claim is paid in full as required by

the Plan, the Pre-Petition Agent and the Pre-Petition Lenders shall prepare and file any

and all documents that may be reasonably necessary to effectuate the termination of

such liens and security interests.  The Plan and the Post-Confirmation Loan Agreement

shall supercede and replace the terms and conditions of the Pre-Petition Loan

Agreement and any related documents establishing the Allowed Class 1 Claim.

The Post-Confirmation Loan Agreement and any related documents shall be

executed, delivered and performed by the Reorganized Debtors in accordance with its

terms, and all fees and expenses and other amounts provided for thereunder shall be

paid promptly when due.

## Convenience Creditors

Convenience Creditors are the holders of Allowed Class 2 Claims and are

impaired under the Plan.  Convenience Creditors shall receive 100% of the allowed

amount of their Class 2 Claims payable in full in cash without interest within ninety (90)

days of the Effective Date of the Plan.   The Debtors estimate that there are

approximately 27 Convenience Creditors with Allowed Class 2 Claims aggregating

approximately $13,227.00.

## Unsecured Creditors Exclusive of  Allowed
## Claims of Convenience Creditors and Noteholders

Unsecured Creditors, exclusive of Allowed Claims of Convenience Creditors and

Noteholders, are the holders of Allowed Class 3 Claims and are impaired under the

Plan.  The holders of Allowed Class 3 Claims shall receive 100% of the allowed amount

of their Class 3 Claims ("Unsecured Dividend").  The Unsecured Dividend shall be payable in two (2) equal consecutive semi-annual installments over a one (1) year period commencing on the 15th day of the month following the end of the first six (6) month period after the Effective Date.  No interest shall be paid on the Allowed Class 3 Claims.  The payments to the holders of Allowed Class 3 Claims under the Plan shall be made in full and complete satisfaction of such Claims.  The Debtors estimate that there are approximately 12 creditors holding Allowed Class 3 Claims aggregating approximately $124,161.00.

**Noteholder Claims**

Noteholders are the holders of Allowed Class 4 Claims and are impaired under the Plan.  Subject to the provision of Article VII of the Plan,[7] the Noteholders shall be paid their pro-rata share of $1,200,000.00  ("Noteholder Dividend") to be accumulated from revenue of the Debtors generated in the operation of the Debtors' businesses in the ordinary course.  The Noteholder Dividend shall be payable in equal consecutive semi-annual installments of $100,000.00 over a six (6) year period commencing on the 15th day of the month following the end of the first quarter after the Effective Date.  No interest shall be paid on the Allowed Class 4 Claims.  The payments to the holders of Allowed Class 4 Claims under the Plan shall be made in full and complete satisfaction of such Claims.  After deducting the Allowed Claims of the Subordinated Noteholders as

---

[7]Article VII of the Plan provides for the voluntary subordination of certain of the Noteholders Claims of the Christopher C. Ward Trust dated 2/ 8/96, Louis G. Gineris Trust and Kenneth R. Nichol.

9

provided in Article VII of the Plan, the Debtors estimate that there are approximately 23

creditors holding Noteholder Claims aggregating approximately $9,295,153.25.

The holders of Noteholder Claims are:

- Christopher Ward, Trustee, ECM Grandchildren's Trust, Z Ward Fund
- Christopher Ward, Trustee, ECM Grandchildren's Trust, A Ward Fund
- Christopher Ward, Trustee, ECM Grandchildren's Trust, B Ward Fund
- Jean Ward Hall Trust
- Louis G. Gineris Trust **(to be fully subordinated under Article VII of the Plan)**
- Diane W. Jones Trust
- Diane W. Jones, Trustee, Diane W. Jones Trust dated 4/7/93 Stock Sale Proceeds
- Diane W. Jones, Trustee, S&L Jones Trust, FBO S Jones
- Diane W. Jones, Trustee, S&L Jones Trust, FBO L Jones
- Lenore M. Sesner
- Kenneth R. Nichol **(to be partially subordinated under Article VII of the Plan)**
- Diane Jones, Adminstrator, Estate of David W. Jones, Deceased
- Christopher C. Ward Trust dated 2/8/96 **(to be partially subordinated under Article VII of the Plan)**
- Diane W. Jones & TO, Trustees, ECM Trust FBO Tim Ward DD 1994
- Andrew Ward
- Philip C. Ward, Trustee, FBO Zachary Ward
- Philip C. Ward, Trustee, FBO Alex Ward
- G. G. Gineris or T Lappas-Gineris
- J. J. Gineris or L.G. Gineris
- Christopher C. Ward
- Timothy C. Ward
- Stephen A. Ewing
- Stephen A. Ewing, Trustee, Ewing Family Trust dated 03/07/01
- Peter W. Ewing, Trustee, Christine E. Ewing Trust dated 11/17/94
- Peter W. Ewing, Trustee, Jennifer L. Ewing Trust dated 11/17/94

## Shareholders

The Debtors' Shareholders are the holders of Allowed Class 5 Interests.  Class 5

Interests are impaired under the Plan.  The following individuals are the holders of Class

5 Interests in PCS: Louis G. Gineris; Christopher C. Ward; Kenneth R. Nichol.  PCS is

the holder of the Class 5 Interests in Prime.  The Stock Interests in the Debtors shall be

deemed cancelled as of Confirmation of the Plan. No payments will be made under the Plan to the holders of the Allowed Class 5 Interests on account of such Interests. Furthermore, no dividends will be paid to the holders of the Allowed Class 5 Interests on account of such Interests.

**Claims Objections**

Except as otherwise ordered by the Bankruptcy Court or as otherwise provided in the Plan, the Debtors (and PRC)[8] shall file any and all objections to the allowance of Claims or Interests on or within one hundred and twenty (120) days of Confirmation of this Plan unless extended by Order of the Bankruptcy Court. Cause shall not be a requirement for an extension of this deadline.

## PURPOSE OF DISCLOSURE STATEMENT

This Disclosure Statement is provided to all of the known holders of Claims against and Interests in the Debtors who are entitled to vote their acceptance or rejection of the Plan. This Disclosure Statement is disseminated in connection with the solicitation of acceptances of the Plan filed by the Debtors. The purpose of this Disclosure Statement is to provide such information as would enable a hypothetical, reasonable investor, typical of the holder of Claims and Interests which are impaired under the Plan, to make an informed judgment about the Plan. The Debtors' exclusive

---

[8]"PRC" is PCS Receivables Corp. (See page 20 of this Disclosure Statement and Article VI of the Plan).

period to solicit acceptances of the Plan under Section1121(d) expired on July 13, 2010.

No further extension of this exclusive period is permissible under the Bankruptcy Code.

The information contained in this Disclosure Statement has been submitted by

the Debtors unless specifically stated to be from other sources.  No representations

concerning the Debtors or this Plan, other than those set forth in this Disclosure

Statement, have been authorized by the Debtors. The Debtors believe that all of the

information contained in this Disclosure Statement is accurate.  However, the Debtors

are unable to warrant that there are no inaccuracies.

**Under the Bankruptcy Code, a Class of Claims is considered to have
accepted the Plan if both a majority in number and two-thirds (2/3) of the dollar
amount of those actually voting vote to accept the Plan.  The Claims of those who
do not vote are not counted in determining whether the requisite statutory
majority in number and dollar amount have voted for acceptance.  Acceptance by
the statutory majority will bind the minority who dissent and those who fail to
vote.**

**The Plan requires that the holders of Allowed Claims in Classes 1 through
4 and the holders of Allowed Interests in Class 5 vote on Confirmation of the
Plan.**

## HISTORY AND BACKGROUND

PCS is the parent company and Prime is a wholly owned subsidiary of PCS. The

Debtors file combined tax returns and operate as combined businesses with a single

office located at 200 W. Jackson Blvd., Chicago IL., 60606.

700028816

The following individuals are the officers, directors and stockholders of PCS:

| Name | Title | Shares of Stock Owned In PCS |
|------|-------|------------------------------|
| Louis G. Gineris | President | 1,145 |
| Christopher C. Ward | Vice President | 1,145 |
| Kenneth R. Nichol | Treasurer | 126 |

Additionally, Diane W. Jones, the sister of Christopher Ward, is the Debtors' corporate secretary as well as a fourth director. All of the stock in Prime is owned by PCS.

## Overview of the Business

PCS and its wholly owned subsidiary, Prime, finance and service consumer installment contracts that are generated through the sale of general merchandise and services. The Debtors' businesses are represented by both loans to dealers who originate contracts that are pledged as collateral to PCS as well as loans that are owned and serviced by Prime. The loan contracts cover the purchase of items such as home water treatment systems, carpet cleaning equipment, HVAC installations, home remodeling, security systems, furniture, carpeting, and vacation club memberships. PCS also generates revenue by offering billing, collection, and payment processing services to companies that borrow from PCS and also to companies that do not require financing from PCS. This service business accounted for approximately 26% of 2009 revenue.

Prime purchases retail installment contracts that have been originated by sellers of general merchandise who then assign their interests in the contracts to Prime for

13

payment received by the seller at a discount from face value in the range of 5% to 40%. These contracts range in term from 24 to 60 months with a median average of 40 months and an average balance of $3,800.  The Debtors' have a current combined payroll of 28 employees with operational expertise to bill, service, and collect the outstanding balances owed to the Debtors.

## Historical Perspective of Businesses

PCS was incorporated in 1955 in order to provide loans to the multitude of sales companies then existing in the encyclopedia sales industry. PCS would take a security interest in the installment contracts that were created and service the accounts in order to insure repayment of the loans. Many of these companies expanded into selling and financing other products over the years and PCS continued to lend money and service the various types of receivables that were generated. The primary borrower from PCS was Publishers Acceptance Corporation (now Prime), which operated as an independent sales company of encyclopedias at the time.

As encyclopedia sales diminished in volume, Prime expanded into a full service indirect sales finance company serving the needs of sellers (dealers) who would assign their interest in consumer sales contracts originated throughout the United States. PCS funded its lending activities through a combination of owners equity, retained earnings, subordinated debt and bank debt. PCS  applied for and received loans from  LaSalle Bank and its predecessor banks early in its history ( see Banking Relationships section below). PCS first acquired a partial interest in Prime and then subsequently acquired all

700028816

stock in Prime in 1998.  Prime now operates as a wholly owned subsidiary of PCS.

## Banking Relationships

The Debtors applied for and received loans from Central National Bank (a bank acquired by Exchange National Bank, which was then subsequently acquired by LaSalle Bank in approximately 1981).  During the subsequent annual renewal periods, the credit facility was incrementally increased by LaSalle Bank and four (4) banks acting as participants (with LaSalle Bank acting as agent) to a line of credit limit of $95,000,000.00 for the period August 1, 2007 through July 31, 2008.  The outstanding loan amount reached a high of $86,873,863.00 as of October 31, 2007. In the third quarter of 2007, Bank of America, N.A. entered into a business combination with LaSalle Bank and the loan was thereafter assigned to and began being administered by the Pre-Petition Agent from its offices in Pasadena, California. In response to changing market conditions and the change in banking relationships, PCS began reducing the size of its loan portfolio and had reduced the outstanding loan balance to $64,752,146 by July 31, 2008 (the scheduled maturity date of the loan).

## Events Leading to the Chapter 11 Filings

The Debtors faced a series of events in 2008 that led to the Chapter 11 filings on November 13, 2008.  The Pre-Petition Agent indicated early in 2008 that the Pre-Petition Lenders did not intend to extend or renew the Debtors' loans at maturity. The Debtors applied for loans at several other financial institutions and began preliminary due diligence with Capital One Bank with respect to a potential refinancing of the

700028816

15

Debtors' pre-petition indebtedness. However, this refinancing was not approved. As the loan maturity date approached, the Debtors informed the Pre-Petition Agent that the Debtors would be unable to repay the outstanding balance owed to the Pre-Petition Agent (for the benefit of the Pre-Petition Lenders) at maturity. In the period August 2008 through October 2008, the Pre-Petition Agent and the Pre-Petition Lenders entered into a series of extensions of the loan maturity date with the Debtors which included substantial extension fees, higher interest and further restrictions on borrowing. By October 31, 2008, the Debtors had reduced the outstanding loan to the Pre-Petition Agent (for the benefit of the Pre-Petition Lenders) to $62,410,233.  From November 2007 through November 2008, the Debtors reduced the principal balance due and owing to the Pre-Petition Agent (for the benefit of the Pre-Petition Lenders) by approximately $24,000,000.00.

Effective November 1, 2008, the next loan amendment in this period with the Pre-Petition Agent and the Pre-Petition Lenders was instituted, placing further restrictions on borrowing with required asset sales, additional extension fees and other requirements that the Debtors were unable to satisfy while the economic financial meltdown was occurring at the same time throughout the United States.  Further, the amendment required that the Debtors establish a dominion account with the Pre-Petition Agent that would hold all deposits and receipts of the Debtors with daily reporting to determine whether funds would be available for payroll and other operating expenses. These operating restrictions were such that the Debtors were not confident of the ability to continue uninterrupted business operations and significantly limited the

16

Debtors' ability to borrow any further funds from the Pre-Petition Agent and Pre-Petition Lenders under the existing line of credit. Therefore, in order to preserve the viability of continued business operations, avoid the liquidation of the Debtors' businesses, protect the value of the Debtors' assets and businesses as operational entities, provide a continued source of funds to pay creditors other than the Pre-Petition Agent and the Pre-Petition Lenders, and continue to provide gainful employment to the Debtors' loyal, long-term employees, the Debtors filed these Chapter 11 cases.

## POST-PETITION ACTIVITIES

The continued administration of these Chapter 11 cases have been primarily predicated upon the entry of a series of Cash Collateral Orders entered by the Bankruptcy Court. These Cash Collateral Orders established the framework for the continued operation of the Debtors' businesses and the terms under which the Debtors could use the cash and cash equivalents that serve as collateral to the Pre-Petition Agent (for the benefit of the Pre-Petition Lenders). Although all of these Cash Collateral Orders were entered on a consensual basis, at times, disputes existed between the Debtors and the Pre-Petition Agent which caused the Debtors to prepare for contested hearings on the use of cash collateral. However, in each such instance, the Debtors and the Pre-Petition Agent resolved their differences without ever having to proceed to a contested hearing on the Debtors' right to use cash collateral.

In addition to establishing authorized expenditures of cash by the Debtors during the course of these Chapter 11 cases, these Cash Collateral Orders also set forth the

extent to which the Debtors could make payments to the Pre-Petition Agent (for the benefit of the Pre-Petition Lenders)as their primary secured creditor.  Since the Petition Date, the Debtors have made interest and fee payments to the Pre-Petition Agent and its professionals as of December 31, 2010, in the aggregate amount of $7,796,980.00. The Debtors have also made principal reduction payments to the Pre-Petition Agent during the same period in the aggregate amount of $31,893,443.00, thereby reducing the Allowed Class 1 Claim to $30,697,605.00 as of December 31, 2010.  Additional interest and principal payments have been made to the Pre-Petition Agent from January 1, 2011 through Confirmation of the Plan.

The Debtors have made the following loan repayments to the Pre-Petition Agent as of December 31, 2010:

| DATE | AMOUNT OF PAYMENT | PURPOSE OF PAYMENT | LOAN BALANCE |
|---|---|---|---|
| 12/10/08 | $    600,000.00 | Principal and interest | 62,439.863 |
| 01/09/09 | 600,000.00 | Principal and interest | 62,359.232 |
| 02/09/09 | 600,000.00 | Principal and interest | 61,702,969 |
| 02/20/09 | 500,000.00 | Principal only | 61,702,969 |
| 03/12/09 | 600,000.00 | Principal and interest | 61,517.565 |
| 04/09/09 | 1,100,000.00 | Principal and interest | 60,880,649 |
| 05/08/09 | 1,100,000.00 | Principal and interest | 60,358.619 |

| 06/23/09 | 1,500,000.00 | Principal and interest | 59,710.431 |
| 07/13/09 | 1,500,000.00 | Principal and interest | 58,272,461 |
| 08/10/09 | 1,500,000.00 | Principal and interest | 57,190,468 |
| 09/10/09 | 1,500,000.00 | Principal and interest | 51,157,246 |
| 09/17/09 | 5,000,000.00 | Principal only | 51,157,246 |
| 10/08/09 | 1,600,000.00 | Principal and interest | 49,794,571 |
| 11/10/09 | 1,600,000.00 | Principal and interest | 48,437,938 |
| 12/09/09 | 1,600,000.00 | Principal and interest | 47,051,850 |
| 01/08/10 | 1,600,000.00 | Principal and interest | 45,670,003 |
| 02/10/10 | 1,600,000.00 | Principal and interest | 44,278,103 |
| 03/09/10 | 1,600,000.00 | Principal and interest | 42,362,392 |
| 03/25/10 | 500,000.00 | Principal only | 42,362,392 |
| 04/09/10 | 1,600,000.00 | Principal and interest | 40,974,075 |
| 5/07/10 | 1,600,000.00 | Principal and Interest | 39,556,604.48 |
| 6/01/10 | 500,000.00 | Principal only | 39,236,779.61 |
| 6/08/10 | 1,600,000.00 | Principal and Interest | 37,636,779.61 |
| 7/08/10 | 1,600,000.00 | Principal and Interest | 36,203,073.92 |
| 8/09/10 | 1,600,000.00 | Principal and Interest | 34,785,951.45 |
| 9/09/10 | 1,600,000.00 | Principal and Interest | 33,459,890.21 |

700028816

| 10/08/10 | 1,600,000.00 | Principal and Interest | 32,008,110.45 |
|----------|--------------|------------------------|---------------|
| 11/09/10 | 781,677.57 | Principal and Interest | 31,388,318.22 |
| 12/09/10 | 1,008,745.37 | Principal and Interest | 30,517,808.65 |
| TOTAL | $39,690,422.94 | | |

Summary of loan activity:

**Bank loan balance 11/30/2008**        $62,591,048
**Loan repayments 12/10/2008-04/30/2010**    $39,690,423.00
**Bank fees and interest as of 04/30/2010**   $7,796,980.00
**Bank loan balance 04/30/2010**        $30,697,605.00

Other events have occurred during the course of these Chapter 11 cases. These events include:

- Through the use of its Accountants, the Debtors have successfully completed three (3) audits of their businesses.

- Through the use of its Special Counsel, the Debtors have successfully renegotiated the terms and conditions of their valuable dealer agreements and, then, negotiated extensions of the terms of such dealer agreements.

- The Debtors have obtained an Order from the Bankruptcy Court pursuant to Section 365 of the Bankruptcy Code authorizing the assumption of the lease of its office space at 200 W. Jackson Blvd., Chicago, Illinois.

700028816                                  20

- The Debtors have converted their status to "C" corporations by revoking their subchapter S status pursuant to Order of the Bankruptcy Court.

- Most importantly, the Debtors have operated their businesses during the course of these Chapter 11 cases on a profitable basis and have successfully formulated a Chapter 11 exit strategy that has culminated with the filing of the Plan.

Finally, as a result of extensive negotiations with the Pre-Petition Agent and the Pre-Petition Lenders, the Debtors have filed the Plan which is supported by the Pre-Petition Agent. This agreement should result in a quicker Confirmation of the Plan.

## OTHER ASPECTS OF THE PLAN

In conjunction with Confirmation of the Plan, Prime will be merged into PCS thereby formally consolidating the Debtors' businesses, assets and liabilities into a single consolidated entity with PCS being the surviving entity. Upon such merger, PCS will change its corporate name to "PCS Receivables Corp." ("PRC"). This merger is expressly conditioned upon Confirmation of the Plan and shall be deemed effective upon such Confirmation. PRC shall be obligated under the Post-Confirmation Loan Agreement. Attached to this Disclosure Statement as **Exhibit C** is a copy of the proposed Agreement and Plan of Merger of Prime into PCS. PRC shall assume all of the Debtors' liabilities, obligations and duties under the Plan upon Confirmation of the Plan. Whatever is required of the Debtors under the Plan, shall be deemed required of

700028816

21

PRC.   PRC, through its President, Kenneth Nichol, shall be the disbursing agent charged with making the payments required under the Plan to the holders of Allowed Claims.   Upon Confirmation and in furtherance of the merger described herein, common stock in PRC will be issued to Louis Gineris ( 1145 shares), Christopher Ward ( 1145 shares) and Kenneth Nichol ( 126 shares).

Under the Plan, the Christopher C. Ward Trust dated 2/8/96, the Louis G. Gineris Trust and Kenneth R. Nichol ("Subordinated Noteholders") voluntarily agree to subordinate their Noteholder Claims in the following manner by reducing the amount of their Noteholder Claims as follows:

| Subordinator Noteholder | Amount of Noteholder Claim | Reduced Amount of Noteholder Claim Under Plan |
|---|---|---|
| Christopher C. Ward Trust Date 2/8/96 | $1,062,696.34 | $856,298.99 |
| Louis G. Gineris Trust | $ 206,397.35 | $0.00 |
| Kenneth R. Nichol | $ 81,179.03 | $ 58,466.31 |

By agreeing to these reduced Noteholder Claims, the Subordinated Noteholders have effectively increased the pro-rata distribution of the Noteholder Dividend to the holders of Allowed Noteholder Claims.  The purpose of this voluntary subordination is to enhance the return under the Plan to the holders of other Allowed Noteholder Claims.

Management of the Debtors will remain unchanged after Confirmation.  Those persons presently serving on the Debtors' Boards of Directors and as officers of the Debtors will continue to serve after Confirmation in such capacities.   Messrs. Gineris,

Ward and Nichol and Ms. Jones shall be the directors of PRC. The corporate officers of PRC shall be as follows: Louis Gineris, Chief Executive Officer; Kenneth R. Nichol, President; Christopher C. Ward, Vice President; and Diane W. Jones, Secretary.

Upon Confirmation of the Plan, the Debtors and PRC shall be revested with their assets, subject only to the terms and conditions of the Plan. The Debtors and PRC shall be entitled to continue to operate and manage their businesses and financial affairs without further Order of the Bankruptcy Court, except as hereinafter set forth. Payments to creditors pursuant to the Plan will be made from existing cash deposits and from funds from continued business operations. If necessary, the Debtors (and PRC) may borrow funds sufficient to pay the balance of the Allowed Class 1 Claim as required by the Plan or such earlier date as the Debtors (and PRC) may elect at their sole and exclusive option.

Upon Confirmation, an injunction under Section 524 of the Bankruptcy Code shall arise to prevent any party from foreclosing its lien or security interest or otherwise enforcing its Claims against the Debtors and PRC and their assets in this bankruptcy case except as authorized in the Plan. Such injunction shall not affect any secured creditor's right to foreclose upon any security interest provided in the Plan in the event of any post-Confirmation default under the Plan. This injunction will remain in effect until all distributions under the Plan have been made.

Upon the Effective Date, pursuant to section 1123(b)(3) of the Bankruptcy Code, but subject to Article XVIII of the Plan, each Debtor, in its individual capacity and as a debtor-in-possession for and on behalf of its respective Estate, will release and

700028816                                    23

discharge and be deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged all Released Parties for and from any and all Claims or causes of action existing as of the Effective Date in any manner based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Debtors' Chapter 11 cases, the purchase, sale, or rescission of the purchase or sale of any security of the Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Equity Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the restructuring of Claims and Equity Interests prior to or in the Debtors' Chapter 11 cases, the negotiation, formulation or preparation of the Plan, the related Disclosure Statement, or related agreements, instruments or other documents, or any other act or omission, transaction, agreement, event or other occurrence taking place on or before the Effective Date of the Plan. The Reorganized Debtors and any newly-formed entities that will be continuing the Debtors' businesses after the Effective Date will be bound, to the same extent the Debtors are bound, by the releases and discharges set forth above.

On the Effective Date, (a) each Person who votes to accept the Plan and (b) to the fullest extent permissible under applicable law, as such law may be extended or interpreted subsequent to the Effective Date, each entity (other than a Debtor), which has held, holds, or may hold a Claim against or Interest in the Debtors, in consideration for the obligations of the Debtors and the Reorganized Debtors under the Plan, will have conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged all Released Parties for and from any Claim or cause of action existing as of

24

the Effective Date based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Debtors' Chapter 11 cases, the purchase, sale, or rescission of the purchase or sale of any security of the Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Equity Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the restructuring of Claims and Equity Interests prior to or in the Debtors' Chapter 11 cases, the negotiation, formulation or preparation of the Plan, the related Disclosure Statement, or related agreements, instruments or other documents, or any other act or omission, transaction, agreement, event or other occurrence taking place on or before the Effective Date of the Plan.

The Plan is self-executing.  The Debtors and PRC shall not be required to execute any newly created documents to effectuate the terms of the Plan.  Upon payment as required by the Plan, any liens supporting such Claims shall be deemed released and discharged.

All executory contracts and unexpired leases which exist between the Debtors and any other party, whether such executory contract be in writing or oral, which has not been previously assumed, assigned, rejected or otherwise terminated by the Debtors shall be assumed upon Confirmation of the Plan pursuant to Sections 365 and 1123(b)(2) of the Bankruptcy Code.  Any and all Claims asserted by any party arising from the rejection of executory contracts and unexpired leases pursuant to the Plan must be filed on or within thirty (30) days following the rejection.  Further, with respect to Claims for default relating to any unexpired lease or executory contract that is assumed

700028816

25

pursuant to the Plan, any and all such Claims must also be filed on or within thirty (30) days following Confirmation.  Allowed Claims emanating from the rejection of unexpired leases and executory contracts will be treated as Class 3 Claims.  Allowed Claims for default emanating from the assumption of unexpired leases and executory contracts will be treated as Administrative Claims.  Any person failing to file such a Claim within the time provided in the Plan shall be forever barred from asserting such Claim and shall not receive any distribution under the Plan.  The provisions for assumption, assignment and rejection shall be equally applicable to executory contracts and unexpired leases of real and personal property.

The Bankruptcy Court shall retain jurisdiction for certain specified purposes.  Any distribution under the Plan that remains unclaimed sixty (60) days after the distribution is made will become property of the Debtors and PRC, and will not be recouped in subsequent distributions.

The Debtors will have the right to make any distribution to creditors earlier than required by the Plan, without penalty.  However, in the event that the Debtor elects to make any such early distribution while the Allowed Class 1 Claim remains unpaid, such early distribution may only be made with the consent of the Pre-Petition Agent and the Pre-Petition Lenders.  In the event that the Allowed Class 1 Claim is paid in full as of the time of any such early distribution, no consent from the Pre-Petition Agent or the Pre-Petition Lenders shall be required.

Subject to the release and exculpation provisions set forth in Article XVIII of the Plan, the Debtors shall have the right, power and authority after Confirmation of the

Plan to commence any preference, fraudulent conveyance or other litigation it deems appropriate.[9]  The Bankruptcy Court shall retain jurisdiction for such litigation.

The provisions of the Plan shall bind all creditors, Interest holders and parties in interest.   Except as expressly provided in the Plan or the Bankruptcy Code, no interest or penalties accruing on or after November 13, 2008, shall be paid on any claim nor shall any creditor claiming any such interest or penalty be entitled to have its claim for interest or penalty allowed for payment.   To the extent necessary, pursuant to Section 1129(b) of the Bankruptcy Code, the Debtors intend to request that the Bankruptcy Court confirm the Plan if all applicable requirements of Section 1129(a) of the Bankruptcy Code, other than Section 1129(a)(8), are met.

## **LIQUIDATION ANALYSIS**

Failure of the Debtors to obtain Confirmation of their Plan could result in a forced liquidation or a conversion to a case under Chapter 7 of the Bankruptcy Code and immediate termination of the Debtors' business operations.  Upon termination of business operations, all employees would be discharged and unavailable to collect the Debtors' accounts receivable.  The following comparison indicates the likely results of a forced liquidation and shows that, under the Plan, unsecured creditors are getting substantially more than such creditors would receive in a liquidation.

The Debtors' assets and their value as estimated by Debtor's management (without appraisals) as of December 31, 2010,[10] are as follows:

---

[9]/ The Debtors have not completed an analysis of potential preference and fraudulent

27

| Description | Debtor's Estimated Market Value | Debtor's Estimated Liquidation Value |
|---|---|---|
| Cash | $2,415,406.77 | $2,415,406.77 |
| Security Deposits With Landlords | $27,880.42 | -0- |
| Deposits With Utility Companies | $16,700.00 | -0- |
| Accounts Receivable (Prime) | $41,664,156.67 | $31,148,000.00[11] |
| Accounts Receivable (PCS) | $10,946,912.83 | $9,674,307.00[12] |
| Recovery Accounts Receivable of Prime | $43,814,676.05 | $876,300.00[13] |
| Foreclosed Accounts Receivable of PCS | $2,768,758.15 | $1,318,000.00[14] |

conveyance claims. The Debtors believe that no such litigation claims exist.

[10]The Debtors are valuing their assets as of December 31, 2010, as this is the projected date of Confirmation of the Plan.

[11] At liquidation, Prime estimates that approximately 70% of its accounts receivable will be collectible. This discount accounts for the fact that in a liquidation Prime's collection personnel would be unavailable to collect the accounts receivable. This discount also applies a reasonable attrition rate for the collection of accounts receivable by a company that is no longer in business .

[12]At liquidation, PCS estimates that approximately 85% of its accounts receivable will be collectible. The only reduction to the value of PCS' accounts receivable at liquidation is to account for dealer overadvances of approximately $1,300,000.00.

[13]"Recovery Accounts Receivable" of Prime are those accounts receivable that have been written off by Prime as uncollectible. The liquidation value of these Recovery Accounts Receivable represent a historical estimate of value for such accounts.

[14]"Foreclosed Accounts Receivable" of PCS are amounts due from G&M International which have been turned over to PCS for collection. The liquidation value of the Foreclosed Accounts Receivable was derived by assessing the diminished credit quality of the account debtors owing such monies to G&M International.

700028816

28

| Description | Debtor's Estimated Market Value | Debtor's Estimated Liquidation Value |
|---|---|---|
| Office Equipment and Supplies | $128,000.00 | $12,800.00[15] |
| Customer Lists | Unknown | Unknown |
| PCS Dealer Agreements | Unknown | $10,000.00 |
| Preference, fraudulent conveyance and other avoidance actions | -0- | -0- |

According to the above chart, the estimate of Debtors' management of the total liquidation value of the Debtors' assets is $45,454,813.77.

The Debtors' liabilities as of Confirmation of the Plan may be summarized as follows:

| Liabilities | Amount |
|---|---|
| Pre_Petition Agent | $30,697,604.84 |
| Administrative Claims (exclusive of post-petition trade claims incurred in the ordinary course) | $375,000.00 |
| Tax Claims | $34,485.45 |
| General Unsecured Claims (exclusive of Subordinated Noteholders) | $9,432,541.25 |
| Subordinated Noteholders | $1,350,272.72 |
| **Total**: | $41,889,904.26 |

---

[15] At liquidation, the Debtors estimate that 10% of the value of their equipment will be realized.

700028816

29

In the event of a forced liquidation, such as foreclosure by the Pre-Petition Agent on its liens and security interests, any proceeds realized from the liquidation of the Debtors' assets would first be used to pay the costs of collection of accounts receivable and administration thereof, which for purposes of this discussion, the Debtors have estimated to be an amount equal to forty percent (40%) of the gross collection proceeds. Once the costs of collection have been paid, secured, administrative and priority claims would be paid. Only after making the above disbursements of liquidation proceeds could any distribution be made to general unsecured creditors. The following chart depicts the likely distributions of liquidation proceeds realized from the forced liquidation of the Debtors' assets:

|  | | **Amount** |
|---|---|---|
| Forced Liquidation Less: | | Gross Proceeds from $45,454,813.77 |
| (b) | Pay-off of secured, administrative and priority claims (exclusive of post-petition trade payables incurred in the ordinary course of business) | $30,967,845.00 |
| Approximate Balance Available For Distribution to Unsecured Creditors | | ($3,286,197.16) |

(a)

---

[16]For purposes of this calculation, the Debtors have only charged the Accounts Receivable of Prime and PCS, the Recovery Accounts Receivable of Prime and the Foreclosed Accounts Receivable for the 40% collection/administration cost and have charged no costs of liquidation to its office equipment and supplies. This 40% collection cost rate is based upon historical rates typically charged by attorneys and collection agencies retained to collect accounts receivable.

Since the Unsecured Claims inclusive of Subordinated Noteholders[17] equal approximately $10,782,813.97 payment of the Unsecured Dividend and Noteholder Dividend under the Plan represents substantially more than unsecured creditors would ever receive in a liquidation (which according to the above calculation is nothing). Furthermore, the existing trade debt to be paid according to ordinary business terms would also be included in the pool of Administrative Claims thereby substantially increasing the total dollar amount due Administrative Claimants in a liquidation and further reducing the funds available for unsecured creditors.  Also, the projected amount allowable for Administrative Claims, in the event of conversion, would further increase to account for the fees and costs attributable to a Chapter 7 Trustee and his administration or the Pre-Petition Agent and its liquidation of its collateral.

Clearly, upon forced liquidation, unsecured creditors would get nothing. Accordingly, the Plan offers unsecured creditors substantially more than such creditors would receive in a liquidation.

## IMPLEMENTATION OF THE PLAN

As discussed throughout this Disclosure Statement, distributions under the Plan shall be made from cash deposits existing at the time of Confirmation and from proceeds realized from the continued operation of the Debtors' businesses by the Debtors and PRC. The Debtors and PRC do not intend to liquidate any of their assets in

---

[17] In the event of a forced liquidation or conversion, the unsecured claims of Subordinated Noteholders would be grouped with all other unsecured creditors.

order to make the payments required under the Plan.  If necessary, PRC may borrow

the funds sufficient to make the balloon payment due to Bank of America.

## FEASIBILITY AND FAIRNESS OF PLAN

Attached to this Disclosure Statement as **Exhibits D through F** are consolidated

audited financial statements pertaining to the Debtors' business activity for the periods

ending November 2008, November 2009 and November 2010.  The purpose of these

Exhibits is to provide creditors with historical financial information concerning the

Debtors' ability to make the payments required under the Plan.  These financial

statements were prepared by Debtors' auditors and are based upon an analysis of

actual business activity.

Attached to this Disclosure Statement as **Exhibit G** are financial projections

pertaining to the Debtor's projected business activity for the six year period following

Confirmation of the Plan.  These projections assume that the Bankruptcy Court will

enter an Order confirming the Plan on June 1, 2011 and that the prime rate of interest

against which payment on account of the Allowed Class 1 Claim will be measured is

projected to be 3.25%.  The purpose of this Exhibit is to provide creditors with projected

financial information concerning the Debtors' ability to make the payments required

under the Plan.  These projections were prepared by Debtors' management and are

based upon an analysis of past business results.

The projections represent reasonable calculations based upon historical

progressions of the Debtors' businesses.  These projections clearly reflect the Debtors'

700028816

ability to perform under the proposed Plan.  Furthermore, the Debtors' achievements during the course of this reorganization case further indicate that the Plan is feasible.

The Debtors believe that the Plan represents an opportunity for the holders of Allowed Claims to receive substantially more than such claimants would receive in a forced liquidation.  Given the conservative financial projections and the Debtors' past performance, the Plan is also fair.

## RECOMMENDATION

The Debtors strongly recommend that those persons entitled to vote, vote to accept the Plan.

Respectfully submitted,

PCS FINANCIAL CORP and
PRIME ACCEPTANCE CORP.,
Debtors/Debtors-in-Possession
By: /s/David K. Welch

**DEBTORS' COUNSEL**:
David K. Welch, Esq.
(Atty. No. 06183621)
Arthur G. Simon, Esq.
(Atty. No. 03124481)
Scott R. Clar, Esq.
(Atty. No. 06183741)
Jeffrey C. Dan, Esq.
(Atty. No. 06242750)
Crane, Heyman, Simon, Welch & Clar
135 South LaSalle Street, Suite 3705
Chicago, IL 60603
TEL: (312) 641-6777

700028816