**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| In re: | ) |
| | ) Chapter 11 |
| PCS FINANCIAL CORP., | ) |
| | ) Case Nos. 08-30930 |
| In re: | ) Case Nos. 08-30934 |
| | ) |
| PRIME ACCEPTANCE CORP., | ) |
| | ) Judge Hollis |
| Debtors/Debtors in Possession. | ) |

**AMENDED FINAL ORDER PURSUANT TO 11 U.S.C. §363, RULE 4001(b) OF
THE FEDERAL RULES OF BANKRUPTCY PROCEDURE, AND LOCAL
BANKRUPTCY RULE 4001-2(A)(2) (I) AUTHORIZING THE USE OF CASH
COLLATERAL, AND (II) GRANTING RELATED RELIEF**

Upon the motions, dated November 13, 2008 (the "Motion"), of PCS Financial

Corp. ("PCS") and Prime Acceptance Corp. ("Prime Acceptance" and together with PCS, the

"Debtors") seeking, among other things, the Debtors' emergency use of cash collateral ("Cash

Collateral") pursuant to section 363 of the United States Code (11 U.S.C. §§ 101, et seq.) (as

amended, the "Bankruptcy Code"), as more fully set forth in the Motion; an interim hearing on

the Motion having been held on November 18, 2008; and a second interim hearing on the Motion

having been held on December 2, 2008; and a final hearing on the Motion having been held on

January 6, 2009; and continued status hearings on the Motion having been held on February 12,

2009, April 2, 2009, May 29, 2009, June 16, 2009, August 29, 2009, September 10, 2009,

September 17, 2009, March 18, 2010, May 20, 2010, June 22, 2010, December 9, 2010,

February 17, 2011 and May 26, 2011; and notice of the Motion having been given as set forth in

the Motion and in the Amended Notice of Hearing; and it appearing from the record before the

13437816.21 08135930

Court (as defined herein) and after due deliberation that sufficient cause exists for the entry of

this Order, the Court makes the following findings and enters its Order, all as set forth below:

## FINDINGS

A.    The Debtors commenced their cases (collectively, the "Cases") by the filing of

voluntary petitions for relief under chapter 11 of the Bankruptcy Code on November 13, 2008

(the "Petition Date"), in the United States Bankruptcy Court for the Northern District of Illinois

(the "Court").

B.    The Debtors intend to operate such operating businesses and manage their assets

and affairs as debtors in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

C.    The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157(b) and

1334.

D.    This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).

E.    A final hearing was held pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2)

on January 6, 2009 (the "Final Hearing").  Notice sufficient under the circumstances of the Final

Hearing and the relief requested in the Motion was given to (i) the Office of the United States

Trustee, (ii) counsel to the Agent and the Lenders, (iii) the creditors holding the 20 largest

unsecured claims against each of the Debtors; and (iv) all other parties that have requested to

receive notice of pleadings in the Cases.

F.    At the Final Hearing, it was represented to the Court that:

1.    Prior to the Petition Date, the Debtors obtained financing pursuant to that

certain Third Restated Loan and Security Agreement, dated as of September 1, 2002 (as

amended, supplemented or otherwise modified prior to the commencement of this chapter

11 case, the "Credit Agreement"), by and among the Debtors, as borrowers, certain

2

13437816.21 08135930

financial institutions, including Bank of America, N.A. ("Bank of America"), as lenders

(the "Lenders"), and Bank of America, as administrative agent (the "Agent").  The

Debtors have acknowledged that the Agent and the Lenders assert that they have valid

claims under the Credit Agreement and/or other agreements secured by senior and

perfected in substantially all of the Debtors' assets (the "Prepetition Collateral").

However, there has been no adjudication as to the validity, amount, enforceability,

priority, and/or perfection of the claims, liens, and security interests of the Agent and/or

the Lenders, and accordingly, nothing contained in this Order shall constitute a final

determination by this Court with respect to the amount, validity, enforceability, priority,

and/or perfection of the claims, liens, and security interests of the Agent and the Lenders;

provided, however, that the rights of the Debtors and other persons or entities to

challenge the amount, validity, enforceability, priority, and/or perfection of the claims,

liens, and security interests of the Agent and the Lenders shall be subject to the

provisions of Paragraph 18 hereof.  As a result, payments (if any) hereunder to the Agent,

on behalf of the Agent and/or the Lenders, shall be provisional.  On the other hand,

nothing contained in this Order shall constitute any concession by the Agent, whether on

behalf of the Agent, any of the Lenders, or otherwise, of any deficiency of any nature or

type whatsoever with respect to any such claims, liens, or security interests.

     2.     The Debtors' use of Cash Collateral as provided herein is necessary to

fund the Debtors' day-to-day operations and the administration of these chapter 11 Cases.

In particular, the Debtors have no cash or assets readily convertible into cash that are not

subject to the asserted liens and security interests of the Agent and the Lenders.  Absent

this Court's authorization to use the Cash Collateral, the Debtors will be unable to meet

13437816.21 08135930

payroll obligations as well as other ordinary course business expenditures that are essential to the Debtors' existence as going concerns.

3.      The Agent has withdrawn its objection to the relief provided herein in return for the adequate protection lien and other protections granted pursuant to the provisions of this Order.

G.      Based on the record before this Court, it appears (and the Debtors and the Agent and the Lenders have stipulated) that the terms of this Order, including, without limitation, the terms of the Debtors' use of Cash Collateral and the provision of adequate protection therefor are fair and reasonable, reflect the Debtors' exercise of prudent business judgment consistent with their fiduciary duties, and are supported by reasonably equivalent value and fair consideration.

H.      This Court concludes that entry of this Order is in the best interests of the Debtors' estates and creditors as its implementation will, among other things, allow for the flow of supplies and services to the Debtors necessary to sustain the operation of their existing business and enhance their prospects for a successful reorganization.

## ORDER

Based on the foregoing, it is hereby ORDERED, ADJUDGED AND DECREED that:

1.      The Motion is granted to the extent set forth in this Order.

2.      Subject to the terms and conditions of this Order (but only subject to such terms and conditions), the Debtors are authorized to use Cash Collateral (including, but not limited to, cash constituting the proceeds, product or profits of any Prepetition Collateral, whether received prior to or after the Petition Date) for the period (the "Specified Period") from the Petition Date through a period not to extend beyond July 15, 2011 pursuant to (i) the budgets attached to the prior orders of this Court relating to the Debtors' use of Cash Collateral and (ii) the approved

4

budget attached hereto as Exhibit A (collectively, the "Cash Collateral Budget"). Except as

otherwise expressly provided in this Order, Cash Collateral may be used solely (a) during the

Specified Period, and (b) up to the amounts stated for any line item, during the periods and for

the purposes identified in the Cash Collateral Budget; provided, that during any week in the

Specified Period, the Debtors may spend, or the Debtors' receipts may vary, by up to 10% of the

respective aggregate amount set forth in the Cash Collateral Budget for such week, that the

Debtors' cash balance may vary from the Cash Collateral Budget by 10%. In addition, (1) for

those lines items captioned "Audit Expense", "Consulting Fees", "Legal Expense", "Data

Processing Expense", "Equipment Maintenance and "Replacement" and "Office Expense", any

amount in the Cash Collateral Budget (plus the 10% allowance) not spent in any week will be

available during subsequent weeks prior to the expiration of the Specified Period and (2) for all

other line items, any amount in the Cash Collateral Budget (plus the 10% allowance) not spent in

any week beginning with the week ending June 19, 2009 may be carried through any subsequent

week within a four week period thereafter (thus authorizing the Debtor to "carry forward" such

other projected expenses for a limited period).

      3.     If Cash Collateral is not used for a particular line item in the Cash Collateral

Budget during the period for which Cash Collateral usage is authorized for such line item in this

Order, or if Cash Collateral is used in an amount less than specified in such line item during the

budgeted period, then the Debtors may use the unused balance of such line item in other line

items so long as the aggregate amount expended with respect to such line items does not exceed

the amounts budgeted therefor.

      4.     The Debtors reserve the right to seek authority to use additional Cash Collateral

beyond the amounts set forth herein during the Specified Period either (a) with the further

13437816.21 08135930

written consent of the Agent or (b) as may be further ordered by the Court after notice and a

hearing. The Agent and the Lenders expressly reserve their right, in their sole and absolute

discretion, to grant or withhold any such written consent, and the Agent and the Lenders further

expressly reserve any rights they may have under this Order, the Bankruptcy Code, or other

applicable law to oppose any such relief. Without limiting the generality of the preceding

sentence, the Agent's and the Lenders' consent to use Cash Collateral during the Specified

Period pursuant to the provisions of this Order shall not be deemed to imply or otherwise

constitute consent to the use of Cash Collateral for any purpose after the expiration of the

Specified Period and specifically, the Agent's and the Lenders' consent to expenditures during

the Specified Period shall not imply or otherwise constitute any consent of the Agent and the

Lenders to any such expenditures in future budgets for the period after the Specified Period that

are not the subject of further consensual cash collateral orders. Nothing contained herein

prejudices the rights of either the Debtors or the Agent and the Lenders with respect to any

requested use of Cash Collateral for the period subsequent to the Specified Period.

    5.    Pursuant to sections 361 and 363(e) of the Bankruptcy Code and for purposes of

section 507(b) of the Bankruptcy Code, as adequate protection to the Agent and the Lenders for

the Debtors' use of Cash Collateral and other use or diminution of the value of the collateral

arising on account of the stay imposed under section 362 of the Bankruptcy Code and/or the use

of Cash Collateral or other collateral (and solely to the extent of any diminution of the value of

its prepetition collateral), the Agent is hereby granted a post-petition replacement lien and

security interest in all property, assets, interests in property, and rights of any kind and nature, of

any Debtor (other than actions under chapter 5 of the Bankruptcy Code, which avoidance actions

are expressly excluded from the scope of the adequate protection lien granted pursuant to this

13437816.21 08135930

paragraph 5 of this Order), wherever located, whether existing on the Petition Date or acquired or arising thereafter, which replacement lien and security interest shall be junior only to all valid, enforceable and perfected prior liens in existence as of the Petition Date. The liens and security interest granted to the Agent pursuant to this paragraph shall be valid and perfected, as of the Petition Date, without the need for execution or filing of any further document or instrument otherwise required to be executed or filed under applicable non-bankruptcy law.

      6.     In order to provide the Agent and the Lenders with adequate protection pursuant to 11 U.S.C. § 361 in respect of their interests in the Cash Collateral (existing as of the date of commencement of this case) resulting from the stay imposed under Section 362 of the Bankruptcy Code and in return for the Debtors' use of Cash Collateral, the Agent further shall be entitled to receive and the Debtors shall be obligated to timely make the following adequate protection payments:

      (a)     The Debtors shall pay to the Agent, for the ratable benefit of the Lenders in accordance with the provisions of the Credit Agreement, (i) the net proceeds of Permitted Bulk Sales, if any, consummated in accordance with the terms of this Order, (ii) (a) $500,000 on each of February 25, 2009, April 10, 2009 and May 10, 2009, (b) $900,000 on June 23, 2009, July 10, 2009, August 10, 2009, September 10, 2009, and (c) $500,000 on March 25, 2010 and on June 4, 2010, which payments shall be applied by the Lenders to the principal amount then outstanding under the Credit Agreement, (iii) $600,000 per month on the tenth (10th) day of each calendar month beginning with the month of December 2008 through September 2009, (iv) on or before September 24, 2009, a one-time lump sum payment of $5,000,000, which payment shall be applied by the Lenders to the principal amount then outstanding under the Credit Agreement and (v)

13437816.21 08135930

beginning with the month of October 2009, $1,600,000 per month on the tenth (10th) day

of each such calendar month; *provided* that if, after giving effect to such payment, the

Debtors' cash balance would be less than $3,000,000, the Debtors shall be required only

to make a payment in an amount equal to the greater of (a) the accrued interest on the

Debtors' obligations to the Lenders for the prior monthly period or (b) 25% of the

Debtors' cash collections for such prior month net of the Debtors' cash expenses paid

during such monthly period; *provided further* that to the extent the Debtors fail to make

any $1,600,000 monthly payment hereunder, the Debtors shall make catch-up payments

in any succeeding months in the amount by which the Debtors' cash balance after

payment of such succeeding month's payment is in excess of $3,000,000, until such time

as all reduced payments have been fully made.  Unless expressly provided otherwise, any

payments hereunder shall be applied first to interest and then to principal owing, with the

parties' having agreed that the applicable postpetition rate shall be (a) for the period from

the Petition Date through August 31, 2009, the default rate under the Credit Agreement

and (b) from September 1, 2009 until further order of this Court, the Prime Rate (as such

term is defined in the Credit Agreement) plus 2.00% per annum.

      (b)    As additional adequate protection, the Debtors are further authorized and

directed to promptly pay all reasonable fees, costs and charges (including attorneys',

consultants' and field examiner fees and expenses) incurred by the Agent and/or the

Lenders (to the extent of and subject to the limitations, if any, on the right of the Agent

and/or the Lenders to receive the reimbursement of fees, costs and expenses set forth in

the Credit Agreement) on demand and without further approval of the Court; provided

that with respect to the Agent's and or the Lenders' attorneys' and consultants' fees, the

13437816.21 08135930

following procedures shall be utilized: (i) the Agent shall serve copies of any pertinent fee statements of the Agent's and/or the Lenders' professionals (with appropriate redacting to any time entries advisable in the Agent's good faith judgment to address any concerns about the inadvertent disclosure of privileged or confidential material) upon the attorneys for the Debtors and the Office of the United States Trustee, (ii) such fee statements promptly shall be paid if there are no written objections to the reasonableness of such fee statements from any such parties in interest within ten (10) business days after such delivery, and (iii) if there are any such written objections within such ten business day period, which must be made with specificity and reference particular time entries or expense items that are objected to as being unreasonable or otherwise unrecoverable under the Credit Agreement, the unobjectionable balance of such fee statements promptly shall be paid, with any disputed items to be resolved either by agreement of the Debtors and the Agent and/or the Lenders, upon motion brought before the Court or at the time of the final determination of the Agent's and the Lenders' claims.

7.    In addition, the Agent and the Lenders shall have an administrative claim of the highest administrative priority under Section 507(b) of the Bankruptcy Code for any diminution in the value of the Prepetition Collateral not otherwise protected and satisfied by the lien on the Replacement Collateral granted to the Lenders and any payments made or other adequate protection granted pursuant to this order (the "Superpriority Claim"), including those specified in, or ordered pursuant to Sections 105, 326, 330, 331, 503(b), 507(a) or 726 or any other provision of the Bankruptcy Code or otherwise (whether incurred in the Cases or any or any successive or superseding case of the Debtors under any chapter of the Bankruptcy Code (a

13437816.21 08135930

"Successor Case")), and shall at all times be senior to the rights of the Debtors, any successor

trustee or estate representative in the Cases or any Successor Case.

8.      Notwithstanding any provision of the Motion, this order or the Debtors'

proposed budget to the contrary, the Debtors shall not be authorized to use the Cash Collateral to

originate or acquire new receivables from third parties or otherwise to create "New Originations"

as such line-items are identified in the budget unless: (i) they have complied with the reporting

requirements of the Credit Agreement and this Order; (ii) any such new originations comply with

the Debtors' underwriting standards that are in effect as of the Petition Date; and (iii) such new

originations do not, in the aggregate for any monthly period through August 2009, exceed

42.5%, and thereafter, 45%, of budgeted cash collections for such monthly period as reflected in

the line items of the Cash Collateral Budget labeled "Cash receipts - Prime Acceptance Corp."

and "Cash receipts-PAC agency payments (net)"; provided further that the Debtors shall, on or

before the 7th day of each month beginning with the month of January 2009, undertake a

reconciliation of actual to budgeted cash collections for the prior month whereupon if actual cash

collections varied from the budgeted amount for such prior month, then the amount of budgeted

cash collections for the following month shall (solely for the purposes of the calculation under

clause (iii) above) be increased or decreased by the actual variance in such prior month's cash

collections.

9.      During the Specified Period, the Debtors shall:

(a)      take all reasonable actions necessary to safeguard the collateral from

dissipation;

13437816.21 08135930

(b)    apply Cash Collateral and other sources of cash available to the Debtors hereunder to the expenses of operation of their businesses in all material respects as provided in the Cash Collateral Budget (as modified by this Order) and not otherwise;

(c)    (i)    segregate, as soon as practicable, any collections of receivables for which the Debtors solely act as servicer or for which the Debtors hold such collections in trust for any dealers or other third parties from the cash, collections and other proceeds of the Agent's collateral and (ii) pending any such segregation, maintain a record and accounting of such cash receipts and collections as would enable the tracing and/or differentiation of cash held in any commingled account;

(d)    establish separate cash reserves of (i) not less than $250,000 in a segregated, interest-bearing cash collateral account maintained with Bank of America, N.A. (the "ACH Reserve Account"), to guarantee the payment of any cash management obligations of Bank of America, N.A. incurred as a result of the Debtors' postpetition incoming ACH activity and (ii) not less than $50,000 in a segregated, interest-bearing cash collateral account (the "Merchant Activity Reserve Account"), maintained with MB Financial Bank or with First National Bank of Omaha ("FNBO"), to guarantee the payment of any cash management obligations of MB Financial Bank or FNBO (as the case may be) incurred as a result of the Debtors' postpetition merchant card activity; provided that such minimum reserve amounts shall be adjusted upward or downward monthly (in Bank of America, N.A.'s or MB Financial Bank's or FNBO's (as the case may be) sole discretion, respectively) based upon actual chargeback or return activity for the prior month;

13437816.21 08135930

(e)      pre-fund, in a separate account from the ACH Reserve Account and the

primary debtor-in-possession operating account, any budgeted outgoing ACH activity

that the Debtors will originate for the benefit of any third parties;

(f)      use reasonable best efforts to consummate bulk sales of receivables from

their portfolio of owned receivables at prices above the Debtors' origination cost for such

receivables (each, a "Permitted Bulk Sale");

(g)      (i) consider, and attempt to negotiate in good faith with the dealers, any

reasonable modifications to the dealer agreements proposed by the Agent that the Debtors

agree are warranted, including, without limitation, with respect to eligibility standards,

advance rates or underlying collateral performance or monitoring, and (ii) provide the

Agent and the Lenders at least five business days notice of any proposal to amend or

modify the terms of the existing dealer agreements;

(h)      provide to Agent (or its designees) the following information regarding the

Debtors:

> (i)      a weekly written report delivered to Agent and its financial advisors not later than 12:00 p.m. (Central time) on each Tuesday setting forth for the immediately preceding week (ending on Friday) reflecting actual figures against those set forth in the Budget for such weekly period;
>
> (ii)     a weekly written report on the aging and status of all accounts payable and all accounts receivable owned or financed by the Debtors, including, on a gross basis, the status and amount of any such receivables that are past-due, delinquent or charged-off;
>
> (iii)    a weekly Borrowing Base Certificate, in the form appended as Exhibit B to the Credit Agreement, to the Agent not later than 12:00 p.m. (Central time) on each Tuesday for the immediately preceding week (ending on Friday); and
>
> (iv)     copies of all loan agreements, notes and/or shareholder agreements relating to any subordinated indebtedness of the Debtors in effect on the date hereof; and

13437816.21 08135930

(v)     without limiting the generality of the other provisions of this Order, all financial reporting required by the Credit Agreement;

(i)     use reasonable efforts to reduce existing overadvances with Citizens Finance Company and G&M International, LLC, including by continuing corrective measures discussed with the Agent prior to the date of this Order, and to provide updates to the Agent on the 15th and 30th of each month as to the results of such efforts and the status of the relevant dealer portfolios and loan balances;

(j)     not retain a financial consultant unless such financial consultant is reasonably satisfactory to the Agent (including, without limitation, following the Debtors' review and consideration of potential consultants to be proposed by the Agent and the Lenders).

10.     During the Specified Period, the Debtors shall cooperate with the Agent's field examiners and/or financial consultants. The Debtors shall grant such field examiners and/or financial consultants and their representatives reasonable access to the books, records, personnel, premises and consultants of the Debtors during normal business hours upon reasonable advance notice (which shall be not less than twenty-four hours notice), and the Debtors and their consultants shall cooperate with the Agent's field examiners and/or financial consultants and their representatives with respect to any reasonable request for information, documentation and/or inspection relating to the operations of the Debtors and the collateral securing the Debtors' obligations to the Agent and the Lenders.

11.     In the event that any or all of the provisions of this Order are hereafter reversed, stayed, modified, amended, or vacated by a subsequent order of the Court or any other court, such reversal, stay, modification, amendment, or vacation shall not affect the validity of any right or obligation arising under this Order prior to the effective date of such modification, amendment

13

or vacation, and such right or obligation shall be governed in all respects by the provisions of this Order.

12.      The provisions of this Order and any actions taken pursuant hereto shall survive the entry of any order in these Cases, including, without limitation, any order appointing any chapter 11 trustee or other estate representative for any of the Debtors, any order confirming any chapter 11 plan, or any order converting any of the Cases from chapter 11 to chapter 7, and the provisions of this Order, including, without limitation, the priorities (and applications) in payment, liens, and security interests granted pursuant to this Order, shall continue in these and any superseding cases under the Bankruptcy Code, and such priorities (and applications) and payments, liens and security interests shall maintain their priority as provided by this Order.

13.      In connection with any future hearing on the Motion, the Debtors shall comply with the following procedural requirements (except in an emergency situation requiring expedited relief from the Court):

(a)      to the extent that any future requests to use the Cash Collateral differ from the use originally sought in the Motion or shall be tied to a budget for the period for which such use is required other than that as appended to the Motion, any such request or budget, along with the proposed terms of any such order, shall be served on Agent at least five (5) days prior to any future hearing on the Motion; and

(b)      to the extent that the Debtors intend to rely on affiants or witnesses other than Louis Gineris, Christopher Ward or Kenneth Nichol in support of the Motion, the Debtors shall identify any such additional affiants and witnesses and, in any event, shall make available all of their affiants or witnesses for discussion of the budget for the next period no sooner than two (2) days after delivery to Agent of any extended budget and

13437816.21 08135930

projections, and no later than two (2) business days prior to any hearing on extended use

of Cash Collateral.

14.    The Debtors do not seek to use Cash Collateral to make payments to their

attorneys or other professionals for any of their prepetition fees and expenses during the

Specified Period, and no Cash Collateral shall be used for such purpose during the Specified

Period.

15.    The Debtors' right to use the Cash Collateral shall terminate upon the earliest of

the following:

      (a)    Automatically upon the termination of the Specified Period (*i.e.*, July 15,

            2011); or

      (b)    Forty-eight hours after the Debtors' counsel receives e-mail notification

            from the Agent's counsel that a Cash Collateral Termination Event, as defined

            below, has occurred.

16.    The occurrence of any of the following shall constitute an "Cash Collateral

Termination Event":

      (a)    any default by the Debtors under or failure by Debtor to perform, keep or

observe any term, provision, condition, covenant, promise or undertaking in this Order,

including but not limited to any expenditure of Cash Collateral materially inconsistent

with the Cash Collateral Budget;

      (b)    the Debtors enter into an agreement for the proposed sale of substantially

all of the remaining assets of any of the Debtors to which Agent has not consented (or

indicated its lack of objection) in writing, or this Court enters an Order authorizing the

sale of substantially all of the assets of any of the Debtors to which Agent has objected;

13437816.21 08135930

(c)     the occurrence of a material Event of Default under the Credit Agreement (other than relating to the commencement of the Cases or under any financial covenant) relating to the period following the Petition Date;

(d)     any representation by the Debtors in this Order, or any schedule, statement, report, notice, certificate or other writing furnished by Debtors to Agent is untrue or misleading in any material respect on the date as of which the facts set forth therein are stated or certified;

(e)     the occurrence of any fraudulent act, fraudulent conduct or fraudulent omission by the Debtors;

(f)     the Debtors make payments to, or for the benefit of, their existing equity holders or the holders of any subordinated debt on account of such entities' equity or subordinated debt interests or otherwise on account of any prepetition obligation;

(g)     appointment of a trustee or of an examiner with enhanced powers for the Debtors or the property of the estate of the Debtors;

(h)     conversion of any Chapter 11 Case to a case under Chapter 7 of the Bankruptcy Code;

(i)     dismissal of any Chapter 11 Case or any subsequent case under Chapter 7 of the Bankruptcy Code;

(j)     the entry of an order granting any lien superior or equal in priority to those held by Agent;

(k)     entry of an order under section 506(c) of the Bankruptcy Code surcharging the Prepetition Collateral;

16

13437816.21 08135930

         (l)       the entry of an order granting relief from the automatic stay so as to allow a third-party to proceed against any material asset of the Debtors; or

         (m)     the entry of an order staying, reversing, vacating or otherwise modifying this Order.

      17.     By agreeing to the entry of this Order, Agent does not intend to prejudice or limit any of its or the Lenders' rights under the Bankruptcy Code, any agreement with or relating to any other creditor or party in interest, or other applicable law, including, without limitation, its right (if any) (without the necessity of seeking further relief from the automatic stay imposed pursuant to Section 362(a) of the Bankruptcy Code) to impose an administrative freeze on any of the Debtors' bank accounts in the event that any of the Debtors violate the provisions of this Order or the Debtors' authority to use Cash Collateral hereunder expires by its own terms or is terminated pursuant to the provisions hereof. Without limiting the generality of the preceding sentence, (a) Agent, by withdrawing its objection to the entry of this Order or otherwise, shall not be deemed to have consented, expressly or implicitly, to any surcharge of its collateral under or pursuant to section 506(c) of the Bankruptcy Code, and Agent expressly reserve its rights to oppose any relief that may be sought by the Debtors, any trustee, any other estate representative, or any creditor or other party in interest with respect to surcharge of collateral pursuant to section 506(c) of the Bankruptcy Code, and (b) the rights of the Agent or the Lenders under section 507(b) or other priority provisions of the Bankruptcy Code are not waived, but instead are expressly reserved, in the event that the relief provided herein proves inadequate and Agent or any Lender establishes entitlement to a priority claim under Section 507(b) or any other provision of the Bankruptcy Code, including with respect to the proceeds of any actions under chapter 5 of the Bankruptcy Code.

17

18.    The Debtors and any person or entity, including without limitation the official committee of unsecured creditors (if any has been appointed), with appropriate legal standing and/or authority to do so, shall have through and until March 6, 2009 (unless extended by agreement of the Debtors and the Agent or by order of the Court entered on or prior to March 6, 2009) to commence an adversary proceeding against the Agent or the Lenders for the purpose of challenging the validity, extent, priority, perfection and enforceability of the Agent's or the Lenders' prepetition claims and liens, mortgages and security interests in the Debtors' assets, and any person or entity, including without limitation the Debtors and any committee then or thereafter appointed, that fails to commence such an adversary proceeding within such period shall be barred forever from doing so.

19.    So long as the Debtors' right to use Cash Collateral has not been terminated pursuant to the provisions of this Order and unless there is a subsequent order of the Court, the Debtors are permitted to use the Cash Collateral to pay reasonable professional fees and expenses on a monthly basis in amounts not to exceed the amounts set forth on the Cash Collateral Budget after and to the extent that the payment of such fees and expenses has been approved or permitted (including on an interim basis) pursuant to a procedure authorized by this Court; provided, however, that the Debtors are not permitted to use the Cash Collateral to pay professional fees of the Debtors incurred in connection with (i) the investigation, commencement or prosecution of any action or proceeding of any claims, causes of action, or defenses against the Agent or the Banks or any of their respective officers, directors, employees, agents, attorneys, affiliates, assigns, or successors; (ii) an assertion or joinder in any claim, counterclaim, action, proceeding, application, motion, objection, defense, or other contested matter seeking any order, judgment, or determination of similar relief: (x) challenging the legality, validity, priority,

13437816.21 08135930

perfection or enforceability of the Debtors' obligations under the Credit Agreement or the

claims, liens, and security interests of the Agent and/or the Banks, (y) invalidating, setting aside,

avoiding or subordinating, in whole or in part, the Debtors' obligations under the Credit

Agreement or the Agent's and/or the Banks' claims, liens and security interests, or (z)

preventing, hindering or delaying the Agent's or the Bank's assertion of any lien, claim, right or

security interest or realization upon any collateral; (iii) a request to use Cash Collateral that is not

contemplated by or reflected in the Cash Collateral Budget without the prior written consent of

the Agent; or (iv) a request for authorization to obtain postpetition loans or other financial

accommodations pursuant to sections 364(c) or (d) of the Bankruptcy Code other than from the

Agent without the prior written consent of the Agent.

20.    This Order and the use of Cash Collateral authorized herein shall become

effective as of the Petition Date immediately upon the entry of this Order by the Court. Except

with respect to the payment of accrued items set forth in the Cash Collateral Budget or unless

terminated for cause (within the meaning of section 362(d)(1) of the Bankruptcy Code) on a

prior date by another Order of this Court entered after notice and opportunity for a hearing, the

use of Cash Collateral authorized herein shall terminate on July 15, 2011 at 11:59 p.m.,

prevailing Central time, subject to the Debtors' right pursuant to paragraph 4 hereof to seek

further order of the Court authorizing use of Cash Collateral. Termination of the use of Cash

Collateral authorized herein shall not impair the continuing effectiveness and enforceability of all

other provisions in this Order.

21.    The Agent has agreed to withdraw its objections and reservation of rights to

certain accounting and tax matters as set forth in the Limited Objection of Bank of America,

N.A., as Agent, to the Debtors' Proposed Continued Use of Cash Collateral [Docket No. 102],

13437816.21 08135930

and will not seek to challenge or recover any tax distributions made relating to tax obligations arising in 2008 or prior years to shareholders.

22.     In order to continue their efforts toward the successful negotiation of a mutually acceptable and consensual plan of reorganization (a "Consensual Plan"), effective as of June 9, 2010, the Debtors and the Agent (on behalf of the Lenders) have agreed to suspend any contested litigation over plan issues (the "Plan Litigation Suspension"), subject to the following terms and conditions:

(a)     the Plan Litigation Suspension shall be in effect for the period from June 9, 2010 through July 15, 2011 (the "Suspension Period")

(b)     during the Suspension Period:

(i)     neither the Debtors, the Agent nor any of the Lenders, in any of their respective capacities whatsoever (including, without limitation, as assignee or successor-in-interest to any other party otherwise entitled to propose or support a plan of reorganization or liquidation under the Bankruptcy Code), shall (a) file or otherwise support the filing or proposal of any proposed disclosure statement or plan of reorganization or liquidation (in each case, whether in original form or as an amendment of any previously-filed version) other than a Consensual Plan, or (b) solicit any creditor's acceptance of, or rejection of, any plan other than a Consensual Plan; and

(c)     if no Consensual Plan is confirmed on or before July 15, 2011:

(i)     the Debtors shall have until July 29, 2011 to respond to the Agent's First Set of Interrogatories and First Request for Production of Documents;

(ii)     the Agent and the Lenders shall refrain from seeking to solicit acceptances of any plan of reorganization that is not a Consensual Plan until no earlier than August 19, 2011; and

(iii)     any hearing related to the confirmation of the Proposed Plan (or any modification, supplement, amendment, or successor version thereof) shall be scheduled no earlier than September 16, 2011; and

(d)     subject to the foregoing provisions hereof, each of the Debtors', the Agent's and the Lenders' respective rights, defenses and obligations with respect to the

20

13437816.21 08135930

Disclosure Statement and/or the Proposed Plan, whether substantive or procedural, shall

be reserved and preserved to the maximum extent permitted by applicable law and no

part of the Plan Litigation Suspension shall constitute a waiver of any such rights,

defenses, or obligations under the Bankruptcy Code or other applicable law.

23.    The Plan Litigation Suspension shall not apply in any manner to the pending

adversary proceeding captioned *Bank of America, N.A. v. Ewing, et al.*, Case No. 10-01250.

24.    The Plan Litigation Suspension shall be binding only upon the Debtors, the

Agent and the Lenders (or their respective successors or assigns) and shall not apply in any

manner to any other party in interest.

25.    A further status hearing on the Debtors' use of cash collateral shall be held on

July 12, 2011 at 10:30 a.m., prevailing Central time, before the Court.

26.    The Court shall retain jurisdiction over the parties with respect to the

enforcement and interpretation of this Order.

Dated:    Chicago, Illinois
          May ___, 2011
          MAY 2 6 2011

                                          _____
                                          The Honorable Pamela S. Hollis
                                          United States Bankruptcy Judge

21

Consolidated Cash Flow Estimates

Version 2011-3

Page 1 of 4

| | 6/4/2011 | 6/11/2011 | 6/18/2011 | 6/25/2011 |
|---|---|---|---|---|
| **CASH BALANCES** | | | | |
| **Beginning Cash Balance** | 3,750,000.00 | 3,590,475.00 | 3,002,100.00 | 3,347,875.00 |
| **OPERATING CASH IN FLOWS** | | | | |
| Cash receipts - Owned Accounts | 350,000.00 | 450,000.00 | 550,000.00 | 400,000.00 |
| Cash receipts - PAC Agency Payments (Net) | 5,000.00 | 25,000.00 | 5,000.00 | 5,000.00 |
| Cash receipts - Financed and Foreclosed | 225,000.00 | 400,000.00 | 400,000.00 | 325,000.00 |
| **TOTAL CASH IN FLOWS** | 580,000.00 | 875,000.00 | 955,000.00 | 730,000.00 |
| **TOTAL CASH AVAILABLE** | 4,330,000.00 | 4,465,475.00 | 3,957,100.00 | 4,077,875.00 |
| **OPERATING CASH OUT FLOWS** | | | | |
| Account Refunds | 10,000.00 | | 10,000.00 | |
| Audit Expense | 10,000.00 | | | |
| Bank Charges | | 50,000.00 | | |
| Bank Legal Fees | | | | |
| Billing Outsourcing Expense | | 4,700.00 | | |
| Chapter 11 Quarterly Fee | | | | |
| Collection Expense | 2,000.00 | 2,000.00 | 2,000.00 | 2,000.00 |
| Consulting Fees | | | 5,000.00 | |
| Credit Bureau Inquiries | | | 1,900.00 | |
| Data Processing Expense | 2,500.00 | 2,500.00 | 2,500.00 | 2,500.00 |
| Dues and Subscriptions | | | 300.00 | |
| Employer 401(K) match | | 2,400.00 | | |
| Equipment Maintenance and Replacement | 1,250.00 | 1,250.00 | 1,250.00 | 1,250.00 |
| Equipment Rental/Lease | 500.00 | | | |
| Field Expense | 375.00 | 375.00 | 375.00 | 375.00 |
| Income Tax Payment Estimated | 60,000.00 | | | |
| Insurance Expense - Group Medical/Dental | 15,000.00 | | | |
| Insurance Expense - Workmens Compensation | 1,000.00 | | | |
| Insurance Expense - Other | 7,500.00 | | | |
| Illinois State Replacement Tax | | | | |
| Legal Expense | 15,000.00 | | | |
| Legal (Collection) | 4,000.00 | 4,000.00 | 4,000.00 | 4,000.00 |
| Office Expense | 750.00 | 750.00 | 750.00 | 750.00 |
| Messenger Expenses | 175.00 | 175.00 | 175.00 | 175.00 |
| Vending | 125.00 | 125.00 | 125.00 | 125.00 |
| Electricity | | 750.00 | | |
| Payroll Admin. Expenses (ADP) | | 1,500.00 | | |
| Processing Fees | 17,000.00 | 17,000.00 | 17,000.00 | 17,000.00 |
| Postage / Freight / Shipping (inc CGI, APS, MS & Purchase Power) | 7,000.00 | 7,000.00 | 7,000.00 | 7,000.00 |
| Rent | 33,000.00 | | | |
| Salaries | | 110,000.00 | | |
| Seminars & Education | 500.00 | | | |
| Supplies | 1,250.00 | 1,250.00 | 1,250.00 | 1,250.00 |
| Taxes - Employer Payroll | | 18,000.00 | | |
| Telephone Expense | | 40,000.00 | 5,000.00 | |
| UCC Filings | | 14,000.00 | | |
| Sales Expense | 600.00 | 600.00 | 600.00 | 600.00 |
| **TOTAL WEEKLY OUT FLOWS - Operating Expenses** | 189,525.00 | 278,375.00 | 59,225.00 | 37,025.00 |
| **PREPLANNED EXPENSES AND OTHER EXPENSES** | | | | |
| **NOT NECESSARILY REQUIRING CASH OUT FLOW** | | | | |
| Payments/Expenses - Banks (contingent on $3,000,000.00 floor) | | 635,000.00 | | |
| Payments/Expenses - Other | | | | |
| *TOTAL WEEKLY EXPENSES* | 189,525.00 | 913,375.00 | 59,225.00 | 37,025.00 |
| *APPROX WEEKLY EXCESS CASH INTEREST INC* | 4,140,475.00 | 3,552,100.00 | 3,897,875.00 | 4,040,850.00 |
| **NEW ORIGINATIONS OUT FLOW** | | | | |
| PCS Financial Dealers - New Originations including Reloans | 300,000.00 | 300,000.00 | 300,000.00 | 300,000.00 |
| Prime Acceptance Dealers | 250,000.00 | 250,000.00 | 250,000.00 | 250,000.00 |
| **ENDING CASH** | 3,590,475.00 | 3,002,100.00 | 3,347,875.00 | 3,490,850.00 |

Consolidated Cash Flow Estimates

| | Version 2011-3 | 7/2/2011 | 7/9/2011 | 7/16/2011 |
|---|---|---|---|---|
| ### CASH BALANCES | | | | |
| **Beginning Cash Balance** | | 3,490,850.00 | 3,285,425.00 | 3,003,700.00 |
| ### OPERATING CASH IN FLOWS | | | | |
| Cash receipts - Owned Accounts | | 300,000.00 | 400,000.00 | 500,000.00 |
| Cash receipts - PAC Agency Payments (Net) | | 5,000.00 | 5,000.00 | 25,000.00 |
| Cash receipts - Financed and Foreclosed | | 300,000.00 | 300,000.00 | 375,000.00 |
| **TOTAL CASH IN FLOWS** | | 605,000.00 | 705,000.00 | 900,000.00 |
| **TOTAL CASH AVAILABLE** | | 4,095,850.00 | 3,990,425.00 | 3,903,700.00 |
| ### OPERATING CASH OUT FLOWS | | | | |
| Account Refunds | | 10,000.00 | | 10,000.00 |
| Audit Expense | | 10,000.00 | | |
| Bank Charges | | | 50,000.00 | |
| Bank Legal Fees | | | | |
| Billing Outsourcing Expense | | | 4,700.00 | |
| Chapter 11 Quarterly Fee | | | | 23,400.00 |
| Collection Expense | | 2,000.00 | 2,000.00 | 2,000.00 |
| Consulting Fees | | | | 5,000.00 |
| Credit Bureau Inquiries | | | | 1,900.00 |
| Data Processing Expense | | 2,500.00 | 2,500.00 | 2,500.00 |
| Dues and Subscriptions | | | | 300.00 |
| Employer 401(K) match | | 2,400.00 | | 2,400.00 |
| Equipment Maintenance and Replacement | | 1,250.00 | 1,250.00 | 1,250.00 |
| Equipment Rental/Lease | | 500.00 | | |
| Field Expense | | 375.00 | 375.00 | 375.00 |
| Income Tax Payment Estimated | | 60,000.00 | | |
| Insurance Expense - Group Medical/Dental | | 15,000.00 | | |
| Insurance Expense - Workmens Compensation | | 1,000.00 | | |
| Insurance Expense - Other | | 1,000.00 | | |
| Illinois State Replacement Tax | | | | |
| Legal Expense | | 15,000.00 | | |
| Legal (Collection) | | 4,000.00 | 4,000.00 | 4,000.00 |
| Office Expense | | 750.00 | 750.00 | 750.00 |
| Messenger Expenses | | 175.00 | 175.00 | 175.00 |
| Vending | | 125.00 | 125.00 | 125.00 |
| Electricity | | | | 750.00 |
| Payroll Admin. Expenses (ADP) | | | | 1,500.00 |
| Processing Fees | | 17,000.00 | 17,000.00 | 17,000.00 |
| Postage / Freight / Shipping (inc CGI, APS, MS & Purchase Power) | | 7,000.00 | 7,000.00 | 7,000.00 |
| Rent | | 33,000.00 | | |
| Salaries | | 65,000.00 | | 110,000.00 |
| Seminars & Education | | 500.00 | | |
| Supplies | | 1,250.00 | 1,250.00 | 1,250.00 |
| Taxes - Employer Payroll | | 10,000.00 | | 18,000.00 |
| Telephone Expense | | | | 5,000.00 |
| UCC Filings | | | | 14,000.00 |
| Sales Expense | | 600.00 | 600.00 | 600.00 |
| **TOTAL WEEKLY OUT FLOWS - Operating Expenses** | | 260,425.00 | 91,725.00 | 229,275.00 |
| **PREPLANNED EXPENSES AND OTHER EXPENSES** | | | | |
| **NOT NECESSARILY REQUIRING CASH OUT FLOW** | | | | |
| Payments/Expenses - Banks (contingent on $3,000,000.00 floor) | | | 345,000.00 | |
| Payments/Expenses - Other | | | | |
| *TOTAL WEEKLY EXPENSES* | | 260,425.00 | 436,725.00 | 229,275.00 |
| *APPROX WEEKLY EXCESS CASH INTEREST INC* | | 3,835,425.00 | 3,553,700.00 | 3,674,425.00 |
| ### NEW ORIGINATIONS OUT FLOW | | | | |
| PCS Financial Dealers - New Originations including Reloans | | 300,000.00 | 300,000.00 | 300,000.00 |
| Prime Acceptance Dealers | | 250,000.00 | 250,000.00 | 250,000.00 |
| **ENDING CASH** | | 3,285,425.00 | 3,003,700.00 | 3,124,425.00 |

A/R - Collateral Estimates

Version 2011-3

| | 6/4/2011 | 6/11/2011 | 6/18/2011 | 6/25/2011 |
|---|---|---|---|---|
| **Cash** | 3,590,475 | 3,002,100 | 3,347,875 | 3,490,850 |
| | | | | |
| **Prime Acceptance Corp.** | | | | |
| Beginning Eligible Active A/R | 66,500,000 | 66,556,606 | 66,535,213 | 66,461,819 |
| Plus Finance Charges Earned | 124,250 | 166,250 | 194,250 | 141,750 |
| Less Collections | 355,000 | 475,000 | 555,000 | 405,000 |
| Plus Originations Principal Balances | 287,356 | 287,356 | 287,356 | 287,356 |
| Account Adjustments (-/+) | | | | |
| Net Ending Eligible Active A/R | 66,556,606 | 66,535,213 | 66,461,819 | 66,485,925 |
| | | | | |
| **PCS Financial Corp.** | | | | |
| Beginning Financed Dealer & Foreclosed Accounts A/R | 20,500,000 | 20,575,000 | 20,475,000 | 20,375,000 |
| Less Collections | 225,000 | 400,000 | 400,000 | 325,000 |
| Plus Originations & ReLoans | 300,000 | 300,000 | 300,000 | 300,000 |
| Account Adjustments (+/-) | | | | |
| Ending Financed Dealer Accounts A/R | 20,575,000 | 20,475,000 | 20,375,000 | 20,350,000 |
| | | | | |
| Total Cash & Accounts Receivable | 90,722,081 | 90,012,313 | 90,184,694 | 90,326,775 |
| | | | | |
| **Bank Loan** | | | | |
| Beginning Loan | 23,600,000 | 23,703,250 | 23,068,250 | 23,068,250 |
| Less Payments | - | 635,000 | - | - |
| Plus Interest (Estimated) | 103,250 | | | |
| Ending Loan | 23,703,250 | 23,068,250 | 23,068,250 | 23,068,250 |

A/R - Collateral Estimates

Version 2011-3

|  | 7/2/2011 | 7/9/2011 | 7/16/2011 |
|---|---|---|---|
| **Cash** | 3,285,425 | 3,003,700 | 3,124,425 |
| **Prime Acceptance Corp.** | | | |
| Beginning Eligible Active A/R | 66,485,925 | 66,575,032 | 66,599,138 |
| Plus Finance Charges Earned | 106,750 | 141,750 | 183,750 |
| Less Collections | 305,000 | 405,000 | 525,000 |
| Plus Originations Principal Balances | 287,356 | 287,356 | 287,356 |
| Account Adjustments (-/+) | | | |
| Net Ending Eligible Active A/R | 66,575,032 | 66,599,138 | 66,545,244 |
| **PCS Financial Corp.** | | | |
| Beginning Financed Dealer & Foreclosed Accounts A/R | 20,350,000 | 20,350,000 | 20,350,000 |
| Less Collections | 300,000 | 300,000 | 375,000 |
| Plus Originations & ReLoans | 300,000 | 300,000 | 300,000 |
| Account Adjustments (+/-) | | | |
| Ending Financed Dealer Accounts A/R | 20,350,000 | 20,350,000 | 20,275,000 |
| Total Cash & Accounts Receivable | 90,210,457 | 89,952,838 | 89,944,669 |
| **Bank Loan** | | | |
| Beginning Loan | 23,068,250 | 23,169,174 | 22,824,174 |
| Less Payments | - | 345,000 | - |
| Plus Interest (Estimated) | 100,924 | | |
| Ending Loan | 23,169,174 | 22,824,174 | 22,824,174 |